The Honorable, the Judges of the United States Court of Appeal for the 4th Circuit. All right, thank you. We'll proceed with our last case. Mr. Brennan, can you hear me? Yes, I can, Your Honor. All right, Mr. Schwab, can you hear me? I can. Mr. Schwab? I can, Your Honor. Ms. Shopler? Yes, Your Honor. Okay, Mr. Shulman? I can, Your Honor. Okay, we'll proceed with the case of Claudio De Simone v. Alfasigma and others. We'll start with Mr. Brennan first. We'll hear from you. Thank you, Your Honor. May it please the Court, Robert Brennan, on behalf of Alfasigma USA, Inc., one of the three appellants splitting the argument today, I'm going to be arguing that the District Court's claims against Alfasigma are ledient, that even if a Lanham Act violation had been proven, the District Court abused its discretion in awarding Actigea windfall in the form of a $15 million disgorgement of Alfasigma's profits, and finally, that the District Court abused its discretion and violated Alfasigma's First Amendment rights in issuing a permanent injunction that bars Alfasigma from citing or referencing clinical studies. Very simply, the denial of the motion as a matter of law with respect to the Lanham Act claims cannot be reconciled with this Court's decision in the Verisign case or with the Supreme Court's decision in Lexmark. Plaintiff asserting, as this Court found in Verisign and other cases, if you're going to assert a claim for false advertising under the Lanham Act, you have to prove each of five separate elements. Failure to prove any one of them is fatal, and the Court has recognized as indispensable and core the fifth element, which requires that the plaintiff show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising, which the Supreme Court in Lexmark has defined as including plaintiff's loss of a sale, a diversion of a sale from the plaintiff, or damage to the plaintiff's goodwill. The District Court ruled in denying that motion that, quote, where a Lanham Act plaintiff seeks not damages, but defendant's profits, it need not show actual injury or harm, but instead must show that the defendant benefited from false advertising. That's simply not the law. It's not the case law. It's not the statutes. There's nothing in 1125A that speaks to disgorgement. That's found in 1117, which is the remedies, which you only get to when a violator... Mr. Brennan, if I could follow up on that point, and in particular talking about it with the Verisign case, does the fact here, which I'm not sure about, but it seems as if you have essentially a two-competitor market, so that is it not at least enough, whether it's conclusive or not, that successful sales by VSL, in effect, mean unsuccessful sales by Exigy. And I'm not sure of the marketplace, but that's the impression I got from doing the work I did. And that seems to distinguish... I know in the Verisign case, it was important that there were 700 or so competitors, and there's no such indication that I've seen here. So if you could address that, please. Certainly, Your Honor. If the party is going to rely on a presumption based upon there being only a two-player market, it's incumbent upon that party to introduce evidence that there are no other players. And in fact, there are many other manufacturers and vendors of probiotics for similar symptoms that these... Well, let me ask you on that just a little further. I was curious about the same thing, and it seemed to me that we're not necessarily talking about a competitive market like in the antitrust laws, but we're talking in a situation where VSL is selling a second product, not the original product, that is alleged to be the same. And so that a purchaser buying VSL is either buying it from VSL or it would buy it from D. Simonone and his designees. In other words, there's only two sources. It's binary. So that if somebody is buying VSL probiotic and thinks it belongs to the original inventor, and in fact, it's a generic or whatever you want to call it, those are the two products compete. And if you give a sale to one, you're taking the sale away from the other, aren't you? No, we'd have to disagree with that. Okay, I know that. I want to hear that. Yeah. That presupposes that if somebody is going to buy a probiotic for these symptoms... It's important for my hypothetical is a VSL probiotic. In other words, we're talking about two products being sold under the VSL label. And so somebody goes on to buy VSL probiotic. They're either going to buy it from Alpha Sigma or they're going to buy it from Simone's designee. Well, the problem with your honor's hypothetical is there's only one VSL and that's the VSL that's manufactured by VSL Pharma and that's sold by Alpha Sigma. That's the entity that owns the trademark VSL3 and that sells it. They don't sell VSL3. They sell VizBio. I understand they changed the name, but the product that VSL sold before the split up was Desimone's invented product. And that's the product they sold and the public bought VSL. That's what they were buying. After the breakup, Desimone pulled the manufacturing away from... His manufacturer didn't authorize selling and VSL manufactured another product. And there was a dispute of fact to whether it's the same or different. The jury found it was different. And so I'm assuming that is a fact until we talk otherwise. So when somebody's buying the second product, I don't care how it's labeled, that's part of the problem. He's either buying it from VSL or he would buy it from Desimone if the full disclosures were made. Well, again, Your Honor, the flaw in the hypothetical is that we have the VSL trademark. To follow that logic, if there was no advertisement, and this is a false advertisement, if there was no advertisement and you continue to sell under the trademark, you can't bring up the same Lanham Act claim. You have the same trademark identifying two different products. That's the problem in the case. Well, they can't sell a product using VSL's trademark, Your Honor. Only VSL can, and it's licensed that right to Alpha Sigma. So the answer to the question is, like I said, if we didn't have any advertising at all, there's no legal requirement under the Lanham Act, certainly, or under the Constitution to prevent us from using our trademark. You can use your trademark, but you applied your trademark for years to product A. When you no longer had authority to use it as product A because it belonged to somebody else, you created a product and still use that trademark as if you're selling product A. That's what the jury found. There's nothing in the jurisprudence of the Lanham Act that says that if I've got a trademark and I've got a product and that product changes, that I need to reach out and proactively advise the public that my product has changed. We're here to change whether or not... You were denied the right to use that product, and yet you led the public to believe it's the same. We sold the public a VSL 3 branded product. There's no dispute that that's what it is. I don't think you're understanding my question. I understand your trademark you own, but you didn't own the product. You marketed the VSL product, a DSME owns, product A. Then you developed product B and made the public think it was product A. You had the right to the trademark, but you didn't have a right to the product. There's no evidence of any reliance. There's not any evidence of lost sale. We're getting well apart from Verisign and from Lexmark, still have to show injury. We submit you can't presume injury, even under the hypotheticals, which as I said, Your Honor, we disagree with. I'm running very, very short of time, so I'm just going to quickly jump to... It was an abuse of discretion not to reduce or vacate the award of profits, because this court in the Synergistic case said, you can't award profits unless you apply a six-factor test and show your considerations, which include whether or not there's been any diversion of sales. The judge... Did Alpha Sigma have other products other than the VSL? Yes. They sold other products? Yes. In other words, the record shows that they had a profits of $27.8 million, and that represented sales of what? Of VSL3 branded product from June to 2016 to August 2018. Oh, so there weren't any other products, it was just that product? In that number, yes. Yes. Okay. Well, then the argument goes, if that was solely VSL product, a branded product, when in fact there were two products represented over the years, the argument is that the misrepresentation produced $27 million in profits, and the verdict is what, $15 million? Your Honor, if there had been any evidence whatsoever that a single purchaser had relied on the alleged false advertisements in purchasing the VSL3 branded product, there might be some something to be said there, but there's zero evidence of that. There was zero evidence that there were any drop in VisBiome sales that correlated with it. You know, that's curious. And they've still made sales. They've still made sales, and that stands out for their making sales. I get online, and I sell Colgate toothpaste, and a purchaser buys Colgate toothpaste, and then it turns out that that was not, that's some generic invented by a hacker. You're saying there's no damage to Colgate? Well, first of all, that's a trademark. No, no, just forget that. I'm talking about a product that was purported to be Colgate toothpaste, and in fact it was not Colgate toothpaste. It was sold under Colgate label, but it was not Colgate toothpaste. Is that person who sold that, created that product and sold it under Colgate, he didn't injure Colgate? In the trademark realm under Section 111.14, if you're proving trademark infringement, you don't have to prove the injury that the Supreme Court said you have to show in Lexmark in the context of a Lanham Act false advertising claim, because your trade, first of all, you have to have a U.S. trademark registration. It's a real, it's an intellectual property, right? And so there are certain presumptions that go with, if I go out tomorrow and sell a toothpaste that I made in my basement and I put a Colgate label on it, yes, they can say I suffered damage because a person is assuming that there's that trademark, and that's what they're putting, that's where the good customer goodwill is, it's in the trademark. So they're saying, I bought Colgate on reliance of the trademark, and Colgate didn't make it, Bob Lennon did. That's not this case. I'm well ahead of my time, so... Okay, we're going to give you even some more time later, okay? I look forward to it, Your Honor, thank you. Okay, thank you. Mr. Schwab, I think you're up next. Thank you, Your Honor. May it please the Court, I represent VSL Pharma. I want to focus on the time period after the patent expired, the beginning of 2015, for my argument regarding the know-how issues, but it's important to remember that the record showed, and Mr. Desimone testified, Exigy was not ready to compete, didn't have the ability to sell, so in response to Your Honor's questions about whether or not this is a binary market, there was no evidence of that, that it deprived Exigy of sales, their own principle said they weren't ready to sell, and that was the flaw in the assumption on, I think, what Mr. Brennan was pointing at. I want to focus on the Court's errors we submit on the know-how issue as it pertained to this time period following the expiration of the patent. We submit there were two errors of the District Court. The first was to eliminate the obligation from Mr. Desimone to prove that he had a protectable trade secret or property interest when the patent expired, and that flowed from the way in which the trial court interpreted its summary judgment ruling to be broader than at least it was understood to be initially, and then applied that throughout the rest of the trial. There were material facts in dispute about whether or not Mr. Desimone had any protectable trade secret interest as of the end of the patent. Judge Qualley, yes, sir. Why does that matter, counsel? I mean, I just don't understand why it's necessary for them to prove there's a trade secret. I mean, if they were seeking trade secret causes of action, I get it, but it looks to me like what the Court found largely is that through contractual provisions, it's acknowledged and determined that, you know, that Mr. Desimone owns the know-how. And, you know, so once, if that's not something that VSL has a right to use because by contract it's determined to be, you know, Desimone's, I don't understand why it has to be a trade secret. It could be a pickup truck. You're using something that's is by contract, and they have an unjust enrichment claim by it. Tell me why that's not right. Because the particular property interest that Mr. Desimone claimed he owned and which he used to support his unjust enrichment claims and his defense to the breach of fiduciary duty was know-how, which he called a trade secret, secret formula, secret sauce. And the nature of that property interest is critical. The fact that the trial judge ruled as a matter of contract that in 2000 Professor Desimone did not assign whatever the know-how was at that point to VSL, my client. That was the contractual interpretation dispute we had. VSL maintained that he had sold whatever he owned in terms of know-how as part of the original investment into the company. When the trial judge ruled, I'm sorry to interrupt you, the trial judge determined as a matter of contract that the know-how had not been sold by Mr. Desimone in 2000. That does not mean that when we get to 2015, after 15 years of development of the product, of selling the product, of investing the product, that there still exists a protectable property interest in know-how. And that's where the Well, but isn't the problem with that? Maybe, maybe that's true. Maybe there could be something that, but that's not all he said. He said that Mr. Desimone owned the know-how. And if he owns it, it only, but it's got a, if he owns it, he has a right, I think, to control how it's used. He can agree by contract to allow VSL to use it, which he did for a period of time. But I think VSL later in, when is it, 2009, once again acknowledges in effect that he owns the know-how under the know-how and licensing agreement. And when that doesn't take effect, it seems to me, you know, that ends VSL's ability to claim it can use the know-how. I just don't get the argument that trade secret, I mean, know-how could be trade secret. I understand that. But I don't see how that is a requirement of him, of his ability to use his know-how to the exclusion of VSL. Your Honor, respectfully, that was an intensely disputed fact at summary judgment. And what the trial court did was effectively eliminate, actually interpreted disputed facts against the non-moving party. I see my time's up. I hope I can answer this question. Sure. Finish your answer to the question. The summary judgment error is the one that then flows through the rest of the proceeding. Because at summary judgment, there should have been a recognition that there was a dispute over whether or not there was a property interest anymore that Desimone owned. Judge Schwong resolved the contract issue, but there were then still other issues about whether the know-how had changed over time. What exactly was the know-how at that moment? Had it been kept secret? Had the confidentiality provisions been put into place? All of those were intensely disputed issues that VSL raised in opposition to summary judgment. And when Judge Schwong grants summary judgment, notwithstanding those facts in error, it then flows through the rest of the trial proceeding. Because his rulings at trial, in terms of sustaining objections to opening statement, running through the eliminate motions, and then giving instruction 16, which was an absolute dagger in terms of both the unjust enrichment and the fiduciary duty claim, saying that Professor Desimone owns know-how at all relevant times. That hadn't been adjudicated on summary judgment, at least not without running roughshod over disputed facts. It couldn't have been adjudicated. Yeah. Thank you. All right. Ms. Shoplar? May it please the court. I am Liesl Shoplar, and I represent Ledient Biosciences. I would like to briefly touch on arguments that are unique to Ledient. As for the false advertising claim, in addition to the arguments already made, there was no evidence of likelihood of injury caused by Ledient, because Ledient stopped advertising BSL number three in June 2016, when it sold that business to Alpha Sigma. Ledient's general counsel testified that it has no plan to reenter the market, and no evidence was presented to the contrary. Further, it was aired to issue a permanent injunction against Ledient. Exigy argued that the rights to market BSL number three could easily be transferred back to Ledient, because Ledient's owner is a minority owner of Alpha Sigma. However, that is pure speculation, and not a certain impending threat of harm, which is the standard for standing to seek inductive relief. This is not a case where a defendant merely promised to discontinue the offending conduct with nothing more. Ledient has been out of the probiotic business for over four years. The evidence does not show immediate or rapid harm by Ledient to Exigy. As to the unjust enrichment claim, DeSimone failed to present evidence of the value of the benefit bestowed on Ledient, and instead only presented disgorgement evidence. Disgorgement for unjust enrichment, however, is not permitted to result in a windfall to the plaintiff, which is the case here. The burden was on DeSimone to prove the value of the benefit to Ledient. He did not. Accordingly, the false advertising and unjust enrichment claims against Ledient should be vacated and remanded for entry of judgment in favor of Ledient. Ms. Schlapper, can I ask a question about the permanent injunction? There was some evidence in the record at some point that a party or someone had violated a previous permanent injunction, and I wonder how that colors your view of whether or not it was appropriate for the district court to be concerned about future violations and not simply rely on the representations of your client, however well-intentioned, or anyone else given the history of litigation between these parties. Yes, Your Honor. To show the threat of harm, it has to be as to Ledient, not as to Alpha Sigma, which is a separate company. So again, there's no evidence at all that there's talk of Alpha Sigma giving it back. And actually, Ledient is completely out of the probiotic business. It has no sales rep in the industry. It specializes now in rare diseases, and that's it. For it to transfer back, it's not this quick, simple thing that could happen overnight. I just don't believe the standards there for injunctive relief, which is an extraordinary remedy. But why do you, I mean, it may be, but I'm sorry, if I could just, but why do you care if you're out of that probiotic business? Yes, Your Honor, it's not about why they care, it's just the injunction was wrongly awarded. So why, you know, should we have this on the book that was awarded against us when there's no grounds for it? You know, it was improper. All right, thank you, Mr. Shulman. Good afternoon, Your Honor. Can you hear me? Yes. Okay. Jeremy Shulman, may it please the Court, Jeremy Shulman for Professor DeSimone and Exegete Pharma. I want to pick up where I think Judge Meyer's questions left off with Mr. Brennan. This is a situation where we have actually a very unique probiotic formulation. It is not part of the larger mix of probiotic products that are on the market. It is one, it is really a one-of-a-kind formulation, and this is the evidence that was adduced abundantly at trial. It's unique because of its high potency. There are versions of this product that are 450 billion colony-forming units of bacteria, an even higher dosage version of 900 billion. There is no equivalent product on the market other than DeSimone formulation with regard to potency. It's also an eight-strain formula. It is not sold over the counter in the way that most other probiotics are sold. It's sold behind the pharmacy counter, actually. It needs to be refrigerated. It is a medical food. It is not a dietary supplement or nutritional supplement that can just be readily purchased. It is supposed to be purchased under the supervision of a pharmacist. So, Mr. Shulman, if I could kind of jump to something. In light of all, I think, what you're saying, Mr. Brennan said that there was no evidence that your client had been damaged, and even if you seek disgorgement under the proximate cause, there must be some evidence of damage. Number one, just tell me, how do you respond to that argument? Well, under the authorities that we all say, I think we have to distinguish between damage and injury or likelihood of injury. So the standard under Section 1125A.1.2, which is the provision we're operating under, requires either injury or likelihood of injury. However, in a case where the plaintiff is not seeking damages for its own lost profit, but rather is seeking to disgorge the benefits to the defendant of the false advertising, we don't have the burden to quantify any particularized harm that the plaintiff has suffered. Rather, we have to show some degree of injury or likelihood of injury as a result of the false advertising. But then we have to show- that you showed, however, of either injury or likelihood of injury. The pathway to that, the district court found, was short and direct from causation to injury. And that comes off the concept of palming off. And the district court cited several cases, the Ellie Norris case, which is a learned hand decision actually out of the Second Circuit, and also the Logan case from the Fifth Circuit. That's a situation where there is- where there's one product, as Judge Niemeyer pointed out, and a competitor comes into the market falsely claiming to have that same product, but they don't have that product. It is very easy for the fact finder, in this case the jury, to infer that sales that went to the dollar-for-dollar to the true owner of the product. Because- So that's your argument, or the evidence that was made, that because of the nature of this product, if it went to VSL, it didn't go to you? Is that how you would answer that question? Well, I would expand on that, Judge Paulbaum, because I would say we had several experts and other witnesses who, I think, punctuated that point. For example, our medical expert from Harvard Medical School, Dr. Fasano, made it very clear about the importance of citing- having clinical data to support a high-potent probiotic product like this. And he said no doctor would- he certainly wouldn't prescribe it, but he said categorically, no doctor would prescribe a product that does not have the benefit of any clinical data being performed- clinical studies being performed on the product. This new VSL formulation had never been studied in any context. There's no doubt- So I'm familiar with that- I'm familiar with that testimony, and I think there was evidence that you put up that the doctors would not have prescribed Italian VSL had they known that it hadn't been studied. How does that translate either to injury to you or likelihood of injury to you? Because it's those consumers who had been purchasing this very unique product, the DeSimone formulation, under the VSL3 brand, but still this unique product of this formulation, which had 60 clinical studies in a very successful, very rich history. They were looking to buy this product. They were deceived into- they thought they were buying this product through the new VSL3, Italian VSL3 formula. That was false. And so the fair inference is they were looking for a particular product. They went to VSL because of the false advertising. Had they not been deceived, they would have bought it from the only company that offers this product in the world. Did anyone- did an expert testify to that, or is that just an argument that you're making? Or did- I think Dr. Fasano testified to that. I think Ms. Linke, Susan Linke testified to that. She was a dietitian. She was a fact witness who testified. She manages an internet domain. She mentors 2,000 other dietitians. She has 10,000 dietitians and consumers who rely on the advice of dietitians in consuming certain dietary products. And she said, if the formula has changed, if the strains are different, I couldn't recommend VSL3 to this community. And she was looking for the original formulation to recommend. Dr. DeTore said a similar thing. Claudio Di Simone, who we designated as an expert, who testified as a hybrid fact, expert witness, echoed that. Mr. Tuohy, the CEO of Exigy, explained how they were losing sales because there was another actor in the market claiming that they had the formula that only Exigy truly possessed. So there really was an abundance of evidence on that, Judge Bottlebob. And I would add, VSL's own expert, they hired a team of microbiologists to try to reverse engineer Professor Di Simone's formula. And one of those microbiologists was a very well-known doctor, Dr. Mary Ellen Sanders. And she herself wrote an internal memo to VSL. It's in the record in Appendix 1711. And she said, unless you conduct a study showing the functional equivalency between the new formula and the old formula, or unless there's some valid scientific rationale to connect the two products, which there was no evidence of in this record, studies done with the old version of the product will not be applicable to the current version. So their own experts are confirming what we argued to be serious. Their own sales manager, Mary Ocneon, said the same thing. And actually, it was very striking. They were actually marketing that VisVolume was the new product, just because it was a new brand name. And they told consumers, it's not VSL that needs to prove the applicability of these historical studies. I think it's VisVolume that needs to. And really, that was backwards. Because VisVolume clearly had the original formula. All these studies that issue were performed on the original formula. And it's VSL that had the new formula. But Ms. Ocneon herself, in her testimony, confirms what Mary Ellen Sanders said, and what all of our participants said, which is when you materially change the product, the old studies don't apply. And when you link that to Dr. Fasano's testimony and Susan Linke's testimony about the importance of clinical data when you're selling a high-potency product like this, nobody would buy it. No doctor would prescribe it. Yet a lot of people continue to buy VSL-free because of the false advertising. I think it's important to note, and this factors into the injunction, the need for permanent injunction here, under the eBay test that Judge Chuang applied. There were significant public health risks here. This was not 7-Up or Sprite, a soda case like they cite in their briefs. This is a medical formulation, very precisely and very specially formulated to manage the symptoms of people who are suffering from very serious gastrointestinal diseases. So on the injunction issue, Mr. Schulman, and I get that. I would like for you to comment on the claim. I get how these specific statements that Italian VSL is the same as what's been tested would be something that might be appropriate for an injunction. But the injunction says you can't cite these studies, and it doesn't give any parameters about how you cite the studies. And as I read that order, it would prohibit truthful statements about those studies. And I'm trying to understand how an injunction that prohibits any mention of a study, even if it's truthful, is not overbroad. It's hard to imagine, Your Honor, a truthful way for VSL to cite those studies. What if they say this? What if they did their own study, and the seven-strand bacteria performs better, and they said we did our own study. Exigy is using something that's done on this other study. If you compare studies, ours is better, and that's truthful. The problem is we have a statement that says you can't use a study without knowing how it's going to be used. That seems to me to be very problematic. I think, Judge Quattlebaum, the context of Judge Huang's ruling is he's saying that Alpha Sigma and VSL cannot make advertising claims that seek to create a continuity, which would be a false continuity, between the new Italian VSL and the original formula. One of many ways in which they were doing that was by citing the studies and claiming that those studies were applicable to their formulation. Sure. And you're right about that, and I don't mean to cut you off, but I'm not arguing with that part of the injunction. I'm arguing with the part that says that you can't cite the studies at all. And if the intent of that was to essentially be connected with the rest of it, maybe it's not as broad as I'm saying. But I think on paper, it's broader than that. Well, look, I think we could hypothesize about ways in which they might be able to cite it in some comparative way, I think, which is the hypothetical you're positing. That has not come up. They don't have any of their own studies that show that their seven-strain product performs in any way kind of equivalently or equivalently. I suppose they could make an application to Judge Wong to get clarity on how to maybe adapt the injunction to that new, unique circumstance. I think when a permanent injunction is entered... Mr. Shulman, can I, just as a follow-up, I mean, is that additional language necessary given what preceded it? I mean, it seems to me that the part of the injunction that you cited before Judge Qualibong asked you about the prohibiting citations almost seems like surplusage. Is there really a need for that? I agree with you, Judge Diaz, because you're right. The main aspect of the injunction is basically to say they cannot tout this false equivalency. And one way, and it's almost giving an example, you're doing that by citing the studies, don't cite the studies. So, yes, the context of the overall injunction can make it clear that prohibitions are centered around anything that will create a false continuity. What's the reasoning or the justification for extending it to leadiant? Because Judge Chuang invoked the legal doctrine that just voluntarily ceasing a conduct, a wrongful conduct that violates the Lanham Act does not necessarily obviate the need for an injunction. There could be situations where the conduct could recur. And so courts have retained the flexibility still to impose an injunction where the company had engaged in this conduct. And there is a reasonable prospect of that conduct recurring. In this case, the linchpin of Judge Chuang's analysis was the fact that the Cavazza family really controls leadiant, controls the VSL Pharmaceuticals Company, which holds the intellectual property rights to the VSL product. So what they could do to circumvent, I think this is what Judge Chuang said he was concerned about, they could circumvent an injunction that just applied to Alpha Sigma or to VSL Pharmaceuticals by either terminating the license that is in favor of Alpha Sigma or just waiting for it to expire and then give the distribution rights back to leadiant. So he was concerned about an effort of circumvention of the injunction. That's because of the common ownership and control that the Cavazza family exerted over these companies. It is true that the interest in Alpha Sigma is a minority interest of the Cavazza family. But what's more relevant is the control that they exert over leadiant and VSL Pharmaceuticals. There'd be nothing to prevent them when the license expires with Alpha Sigma to grant those rights again to leadiant or to some other company that they control. Let me ask you a question quite distinct. What do you believe is the basis for the $15 million verdict? Well, I think there's ample justification in the record for that. And I think Judge Chuang did a careful analysis under the synergistic factors to sort of weigh the appropriateness of our request to increase the award and for Alpha Sigma's request to decrease the award. What we basically, you know, what we put on evidence, and Your Honor asked before what that $27 million number represented, that was the VSL sale. They had other products sold, had other sales, but that didn't come in at trial. We put on the case showing that all of their profits from the false advertising of the VSL-free product were $27 million. The jury came and awarded, you know, almost half of that amount. And it could have been the jury's determination that, you know, not every single dollar that Alpha Sigma earned was attributable to the false advertising, and they would have been within their rights to do that. I think it showed a dispassionate, you know, reasoned analysis by the jury, and they awarded, it's possible that they looked at different advertising at different points in time and were more bothered by, you know, certain of the false advertising and less bothered by other false advertising and parsed it that way, temporarily. I think the point is, there is more than enough justification in the record to say that, you know, the jury acted reasonably within its discretion to award the $15 million. And also, I would point out in the Lanham Act, this is really an equitable consideration, and the court separately and independently did its own analysis and confirmed that it felt, that Schwung felt it was appropriate to peg the compensation at $15 million as opposed to what the parties were separately arguing. If I could spend just a brief moment to talk about Mr. Schwab's argument on the summary judgment ruling. First of all, I didn't see anywhere in their brief where they made any argument to try to unwind the summary judgment ruling as to know-how. That summary judgment ruling was made, and it's really not subject to this appeal. They have a brief reference to that in their opening, but they offer no argument for why Judge Schwab made any kind of error with regard to that know-how ruling. So, I think that know-how ruling stands. It's definitive that Fido DiSimone is the exclusive owner of the know-how at all relevant times, not just as of 2000, but at all relevant times. That's what jury instruction 16 accurately stated. Now, the whole stance of this ruling by the court during the trial, he was adhering very closely or very faithfully to the ruling, and in fact, he gave the defendants really more latitude than I was even happy with by saying, you could still argue that somehow you had a right to use the know-how. You want to defend against the unjust enrichment claim by saying somehow you had access to the know-how. It was found in VSL's files when Professor DiSimone resigned from the company, or somehow you were able to recreate it on your own. You could argue that you had the right to use it. They did argue that. The jury didn't buy it. They're trying to retry this case, first before Judge Schwab, now before the appellate court, but I think we defended and defeated that point by showing, and I see my time has expired. Let me just, if I could just make this final comment. Professor DiSimone had a contractual right, not just because he controlled the know-how, but he had separate agreements with Danisco, the manufacturer, that allowed him to control who they would sell the product to. He did not allow them to sell the product, yet they bought the product anyway, sold it, earned millions of dollars in profits on that, and just didn't want to pay for it. They didn't want to pay a royalty, which they had been doing earlier. All right. Thank you. Thank you. Yeah. All right. Now we'll hear next from, I guess, Mr. Brennan. Is that the right order? That is correct, Your Honor. Can you hear me? Yeah. All right. Thank you, Your Honor. With regard to the injunction, I would point out that there were no copies of the, there were no studies cited in the alleged false advertising. There were no copies of the studies in the record before the court, not in evidence, and no analysis performed by the court to determine whether or not any of the studies, in whole or in part, were an applicable, or not applicable, to the VSL3 branding product. With respect to this concept that, of dollar-for-dollar sales, would have gone to Exigy, that completely ignores all the evidence in the record that Exigy is a startup, didn't even have cash as of the trial in 18 to pay Professor DeSimone royalties, had a tiny staff, couldn't, the idea that there's just no evidential record that supports the idea that they would have made $50 million worth of sales, let alone sales that would generate $50 million worth of profit. Following the court's logic, which has been adopted by Exigy, we would have, no advertising would have been necessary to prove a landmark claim in this case, because it just sold in reference to our registered trademark, and people bought because of the registered trademark, because of the goodwill of the landmark violation, or other way, using the hypotheticals that were used, that we had an affirmative duty, if we're going to use our trademark to send out statements to the public that we don't believe in, and that we think are subject to scientific debate, with regard to a change in the product, that's not the landmark, that's not the Constitution of the United States, and that would be a violation of our First Amendment rights, and I'd refer the court to Video Software Dealers Association v. Schwarzenegger, 556 F3rd 950. I see that I'm about to run out of time, I could say- Can I ask you a question about the trademark that you marketed under, was that a trademark I linked to a product, or was that linked to a source? Usually a trademark represents goodwill, you identify a source, a GM, or whatever it is, or a product, a Chevrolet, and if it's linked to a product, then it seems to me you have more difficulties. If you say the trademark really identifies the company and its products, it creates a different problem, doesn't it? Your Honor, that's just not how trademarks are applied for and issued by the U.S. Patent and Trademark Office. Trademarks are applied for to be used in a class of products or services, in this case, probiotics, health products. Once you have a registered trademark in a class, you can use that trademark with respect to any products that fall within that class. If VSL or ALF came out with a new probiotic tomorrow, they could still sell it under the VSL3 trademark because they own the trademark with regard to products in that class. It's not tied, as far as the trademark rights, the federal trademark rights are concerned, to specific identifiable products, but rather products that are within a class of products. I see I'm over time. I would say that the evidence that was described showing that there was any connection between a lost sale or a diverted sale is misrepresented. We rely on the briefs. I would say that Dr. Fasano, who was mentioned, testified that notwithstanding all this, he's, quote, I was and I am a user of VSL3, and I used VSL3 until the recent past, until I learned of all this, and I still do. That somewhat undermines that testimony. Neither Dr. Fasano nor the dieticians, ever testified that they ever saw any of the alleged false advertising in the ordinary course of their practices, or that it was even likely that any other medical practitioner would have come across these so-called ads, let alone relied on the ads to make their purchase decision, as opposed to the registered trademark. I know we're over time, but let me ask you a sort of a theoretical question. Assume, assume now, I know you're challenged, but assume that you sold product A under your trademark, and then the product was pulled from you, and you created your own product and continue to sell it under a trademark as if it was still product A, and the public purchased it without being informed that there was a change in products. Let's assume they're really different products. What is the remedy for such a misrepresentation? It's, there's no law that says that if I use my registered trademark that that is in and of itself a misrepresentation of anything. Oh, you're not sticking with my hypothetical. My hypothetical is that you used your trademark over the years to identify product A. So you marketed product A under your trademark. Then you lost the rights to that product, not to the trademark, to the product. And you then put in your own product and continued marketing, just as if you were marketing product A. The jury found that was a false representation. Is there any remedy for it under your theories? Not under the Lanham Act. So you could carry out that type of deception, and the public believes they're buying product A, and they don't care, they don't get it. Your Honor, it's not a deception. As I said, I registered the trademark in connection with a class of products, probiotics. I can legally sell any number of probiotics subject to my trademark legally. That has never been found to be a false representation of fact. If the public purchases my product and finds it lacking, there was zero evidence in this case. None whatsoever. Your advertising, at least two pieces of it that I read, your advertising told the public that it is the new product, is basically the same product you've been selling over the years. And that was false. Well, Your Honor, well, that would give me... Is there a remedy? Is there a remedy for that? I... We didn't do that. There's no evidence of it. That's my hypothetical now. Well, it's impossible, Your Honor. Well, yeah. If I went out and if there was evidence that I engaged in a false advertising campaign to claim my product was something that wasn't, and there was evidence that any consumers relied on that advertising to make a purchase decision, or that it damaged the business goodwill of another person in the market, then there would be a remedy under the landmark. If a consumer, and I've never seen a case like this, if a consumer brought a fraud case against us, a common law fraud case saying, you can't use the VSL trademark with a different product. I don't have the citations in front of me, but I know that that has found not to be a legitimate cause of action because... Well, I'm not suggesting with a different product. I'm suggesting with a product that you represent to have been the earlier product that you sold under the trademark. In other words, the risk representation is that the new product is the old product. That's what the jury found, right? The jury found that we had engaged in a Lanham Act violation, even though there was no evidence of any injury caused by the alleged false advertising. Not caused by the use of our trademark. By the alleged false advertising, there's no evidence of it. Okay. Thank you. I think we've heard from... Have we heard... Oh no, Mr. Schwab, you get a short minute. A long minute. I'll take it. Your Honor, to your question, Judge Niemeyer, this is not a private attorney's general statute. If there's no causation and there's no injury to the plaintiff, the Lanham Act doesn't create a private attorney's general. And I think that answers the question. On the question of contract interpretation that Desimone did not transfer the rights in 2000 as a matter of summary judgment, that did not resolve the other issues in the case regarding what about in 2015. There were still disputed issues that became critically important. And Desimone was relieved of his burden of showing he had something of value that he could exclude my client from using in that time period. It flies also in the face of the general understanding that when the patent expired... So you mean over all those years where you pay a 5% royalty for the know-how, acknowledging that Desimone has know-how and the license to use that know-how is geared to a fee, a royalty, it's hard for you to argue that there was nothing there. But Judge, that misstates the evidence. The patent license agreement that provided... Not the patent license. I'm talking about the know-how license agreement. There was no know-how license agreement in effect, ever. There was a 2010 license agreement for the know-how that was not going to come into existence until the patent expired. Professor Desimone terminated that when he resigned. There never was a know-how license agreement. The only license agreement ever in effect was the patent license agreement, which charged the 5% royalty, which is the second argument we make about the damages in this case flying in the face of Supreme Court precedent. Not only is the Lanham Act $15 million judgment contrary to law, but the unjust enrichment award, which is a violation of Kimball and Brulat, because it effectively was a 5% patent royalty after the patent had expired. Well, I understand that issue. Okay, we've heard a lot of good arguments here. I'd like to tell you that the tradition of the court is for the judges to come off the bench and come to the well of the court and shake each of your hands and greet you and thank you for your arguments. It's a longstanding tradition. We can't do that here now, but we do it virtually and welcome you and thank you for your arguments. Maybe sometime you come back and visit us again, and we'll give you a double handshake. Thank you, Your Honor. It's good to see you all, and we'll be back with you after we've decided what to do. Thank you very much. We'll adjourn court until tomorrow morning. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Albert Diaz, A. Marvin Quattlebaum Jr.